UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | |
| v. | : | Criminal No. 18-cr-020 (DLF) |
| | : | |
| **EVELINE CISMARU,** | : | |
| | : | |
| **Defendant** | : | |

## GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States of America respectfully submits this memorandum in aid of sentencing. The government recommends that the defendant, Eveline Cismaru (the "Defendant" or "Cismaru"), be sentenced to a term of imprisonment of time served – that is, the approximately six months time served since her detention in this matter on July 26, 2018, incorporating credit for over four months of detention awaiting extradition in the United Kingdom (from March 23 to July 26, 2018) and further time pursuant to *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), in recognition of Defendant's status as a deportable non-citizen. Under such a sentence, Defendant will serve, in the aggregate, approximately one year detained in various ways. The government respectfully submits that such a sentence would adequately serve the interests of justice as codified in 18 U.S.C. § 3553(a), considering among other things the U.S. Sentencing Guidelines ("U.S.S.G.") and the severity of the offense but also the defendant's minor/minimal role therein, the history and characteristics of Defendant, the hardship of the time served given the distant separation from her very young child, the principles embodied in *Smith*, and – *particularly* – credit for her substantial assistance to the prosecution or investigation (that is, a downward departure pursuant to § 5K1.1 of the Sentencing Guidelines, which motion the United States incorporates into this sentencing memorandum).

**FACTUAL AND PROCEDURAL BACKGROUND**

The government adopts and incorporates the facts set forth in the Agreed Statement of Facts ("SOF"), ECF No. 28, which was incorporated in the Pre-Sentence Investigation and Report ("PSR") at ¶¶ 23-55.

Defendant is a Romanian national who resided variously in the United Kingdom and Romania at the time of the offenses. As set forth in the SOF and PSR, over the course of 2016 and 2017, Cismaru participated in a conspiracy to commit two types of offenses: hacking/intrusion/computer fraud and wire fraud, that is, financial crimes such as extortion (through ransomware) as well as banking/credit card fraud. However, in contrast to her codefendant Mihai Alexandru Isvanca ("Isvanca"), she was a minor or minimal participant in that conspiracy, as recognized by the U.S.S.G. calculation in both the plea agreement and the PSR. Similarly, the procedural history here also reflects early acceptance of responsibility, prompt entry of a guilty plea, and immediate and thorough cooperation with – and substantial assistance to – the government in its investigation and prosecution.

A. **Offenses and Relevant Conduct**

As Cismaru admitted in the signed SOF, in January 2017, as part of her conspiracy with Isvanca (a single conspiracy charged in two counts), the codefendant conspirators committed a computer hacking attack – that is, a ransomware attack – intended to access, control, and lock/encrypt the data on victim computers, before sending a ransom demand to victims in order to decrypt their files. In this case, the ransomware attack included about 126 computers, each connected to the various public outdoor surveillance cameras in the Metropolitan Police Department ("MPD")'s system – just days before the Presidential Inauguration. The ransom

demand sent by defendants to MPD, denominated in the cryptocurrency bitcoin, totaled about $60,800 for all 126 computers. SOF ¶ 2.

Responding to the offense and using a Remote Desktop Protocol, investigators saw defendants' activity in real-time – catching them red-handed. PSR ¶ 25. As investigators watched, the defendants were using one of the computers as a proxy to send out additional ransomware-laden spam emails: defendants had a window open to a commercial mass-emailing site (sendgrid), a second open window had a file ("USA.txt") with 179,616 email addresses, a third window displayed search results for "email verifier" (*i.e.*, to check that the email addresses to be spammed were valid), and a fourth window had instructions for cerber, one ransomware type they used. PSR ¶¶ 25-26. In addition to cerber, defendants had also saved a second type of ransomware, dharma, on MPD's locked computers. PSR ¶ 26. A sample of such cerber ransomware-laden spam email, dated January 11, 2017, was stored in one of the defendants' anonymous email accounts. PSR ¶ 37.

This portion of the defendants' scheme was essentially to anonymously perpetrate high-tech extortion of numerous unknown victims around the world: remotely seize/encrypt their data and force them to pay for its release. The intrusion of MPD's cameras was just one execution of that scheme. But as Defendant admitted, the conspiracy was an ongoing, months-long enterprise.

Further, ransomware attacks, like the one on MPD, were not the only aspect of their conspiratorial scheme to perpetrate computer and wire fraud. In addition, "Isvanca and Cismaru were engaged in credit card and banking fraud activity." SOF ¶ 10, PSR ¶ 35. Cismaru's and Isvanca's email accounts reflected this related form of fraud they perpetrated: online credit card fraud/identity theft, monetized through fake businesses. Specifically, their emails contained

thousands of stolen credit card numbers, including, for example, information related to approximately 2,170 credit cards in Cismaru's account alone.  PSR ¶ 31, 34-35.  Isvanca's email account similarly held information about 1,603 stolen credit cards.  PSR ¶ 34.

The evidence also showed how Cismaru and her co-conspirator monetized these stolen credit cards: through fake businesses purporting to sell items to unsuspecting "customers."  In such a scheme, the defendants received their "customers'" money and sent the goods, re-purchased from a legitimate business; the defendants paid the legitimate business with stolen credit card information; and the credit card issuer/financial institution then suffered the loss (because it paid the defrauded merchant and did not charge the victim customer whose card was stolen).

For example, in January 2017, consistent with their ongoing scheme to distribute ransomware anonymously and to commit credit card/banking fraud, the defendants used their remote control of the MPD computers to further their banking/credit card fraud.  That is, one execution of this fraud scheme – selling a cooking product called a "smoking gun" through a fraudulent business called Lakeland to a "customer" in London – was actively in progress and observed by agents on January 12, 2017.  PSR ¶¶ 39, 25.  Cismaru registered the fake company in her name and with her personal email account.  PSR ¶ 31.  In short, the hack of MPD's surveillance camera system was simultaneously part and parcel of both the ransomware/computer fraud activity and the credit card/banking fraud aspects of the conspiracy.

Defendant participated in the ransomware/computer fraud and banking/credit card fraud conspiracy with knowledge of its considerable scope, affecting thousands of victims.  She "gave [Isvanca] access to her personal email account . . . to perpetrate the fraud scheme." PSR ¶ 30.  Cismaru's personal email account included a January 10, 2017, email attaching the same

"USA.txt" file with the 176,616 email addresses being used to send ransomware-laden spam. PSR ¶ 31. Cismaru's personal account also reflected email exchanges with one of the defendants' anonymous email accounts about access to and control of various victim computers, such as identifiers and passwords for the MPD surveillance camera computers, and a separate exchange with personal identifiers for a different individual, as well as the name and password for their email account. PSR ¶ 38. And, as noted above, Cismaru's account had emails showing thousands of stolen credit cards.

As described below, this was not a one-off offense or crime of opportunity; nor was it small operation: in was an ongoing, months-long conspiracy with several others that began in or about May or June 2016, with Isvanca running the conspiracy out of Cismaru's office space, using her computer(s) and online accounts, and sharing some of the fraud proceeds with her.

### B. Role Adjustment - Cismaru's Minor/Minimal Participation

According to the evidence to date, starting in or about May or June 2016, Cismaru relocated to Romania, where Cismaru then rented an office space for her own business. PSR ¶ 46. For a payment of about £ 1,000 (British) towards the rent, Cismaru allowed Isvanca to use the office space as well. PSR ¶ 46. Cismaru spent nearly every day with Isvanca in the office; she knew "Isvana intended to, and did, use the office to launch ransomware and other malware attacks/schemes." PSR ¶ 46-47.

In addition to the office space, Cismaru "gave [Isvanca] access to her personal email account . . . to perpetrate the fraud scheme." PSR ¶ 30. She also gave Isvanca "the use of her laptops, and usernames and password to her various email accounts, in order to facilitate the ransomware, malware, and credit card schemes." PSR ¶ 51.

By September 2016, Isvanca was making enough money from ransomware, particularly cerber, that he hired three others to assist. PSR ¶ 48. This was necessary because "[o]perating the ransomware virus [control] panel required effort 24 hours a day, as Mr. Isvanca and his accomplices accepted and processed ransom payments" and unlocked victim computers when paid. PSR ¶ 49. Isvanca showed Cismaru the control panel, which reflected, on one column, money generated by the ransomware – the highest amount listed in the column was $200,000. PSR ¶ 49. Cismaru knew that Isvanca "successfully hacked into numerous victim computers, either because [Isvanca] bragged about it, or because he showed her video from victim cameras, or similar observations." PSR ¶ 53.

Isvanca shared some of the criminal proceeds with Cismaru. PSR ¶ 47. Cismaru not only received payment from Isvanca for rent, but also "purchased items for her with proceeds" from the fraud scheme. PSR ¶ 51.

In sum, Cismaru's role in the conspiracy was limited to a minor/minimal facilitating role: providing Isvanca administrative assistance in the form of office space, computer(s), and online accounts, all knowing they would be used for the offenses. As described in the PSR:

> Cismaru lacked the necessary computer knowledge of a "computer hacker," and had only basic computer skills. Therefore, she could not have provided substantial assistance to Mr. Isvanca in the hacking scheme. Generally speaking, Ms. Cismaru, who was aware of Mr. Isvanca's criminal activities, allowed him to use space in her shop to conduct his schemes, and he would assist her financially by providing rent money and information from stolen credit cards, which she then used to benefit herself. Ms. Cismaru had no decision-making authority, was not involved in the planning or organization of the criminal activity, and the financial benefit she received from the fraudulent scheme was substantially less than Mr. Isvanca.

PSR ¶ 57.

### C. Victim Impact

Here, there is no allegation that Cismaru nor Isvanca knew they had hacked MPD's surveillance camera system, or intended to do so. PSR ¶ 52. But that hardly minimizes the seriousness of this ransomware offense: by sending out ransomware to hundreds of thousands of victim email addresses (179,616 in one instance in January 2017 alone) without regard to the victim computers, the Defendant knows the victims could be any computer, including not just individual victims (who store important digital files such as sensitive financial, medical, real property, and personal information; and pictures/videos of loved ones), but also institutional victims, such as hospitals with essential patient data, industrial facilities that rely on digital information to ensure that factories operate safely (and productively), businesses of all types (including small businesses) that need their data to perform services and provide goods, and governmental entities, like MPD, whose data is essential to their ability to serve their public mission. In this case, it is only by chance that the encrypted video from its surveillance cameras did not prove essential to any specific criminal prosecution.

Similarly, the banking/credit card fraud victims of Defendant's conspiracy – the financial institutions who bear the brunt of the financial loss (although it is passed on to consumers and others through higher costs/reduced benefits) and also the individuals whose credit card accounts (and sense of security) are compromised – suffer significant harm, especially (as here) where the victims number in the thousands of accounts.

### D. Procedural History/Cooperation Plea Agreement

On December 15, 2017, Cismaru was originally arrested in Romania. PSR ¶ 17. After initially lying to investigators (denying any involvement in the offense) and fleeing from

extradition in Romania, PSR ¶¶ 41, 55, Defendant was re-arrested on March 23, 2018 in the United Kingdom and ultimately conceded extradition. PSR ¶ 12. Upon her arrival in the United States on or about July 26, 2018, promptly and truthfully debriefed, reached a cooperation plea agreement, and entered it with the Court on September 20, 2018.

Following entry of her guilty plea, Defendant continued her cooperation. She has also indicated to the government and to the Court that, at sentencing, she will agree to a special condition of Supervised Release requiring her to continue such cooperation, including appearing for a Rule 15 deposition as to codefendant Isvanca. Therefore, the government does not oppose proceeding to sentencing.[1]

---

[1] As is standard in this district, the cooperation plea agreement here permits the government to delay sentencing. This means that, ordinarily, the government need not and does not agree to assess a defendant for potential substantial assistance credit nor make a motion for downward departure prior to a defendant completing cooperation. But under the unique and compelling circumstances of this case, the government has agreed to do so here. Among other things:

First, Cismaru represented to the government and the Court at a previous hearing that, as a condition of supervised release, she would continue cooperation and participate in a Rule 15 deposition in the future, if needed, were the Court to proceed with sentencing. (Further, arguably, the plea agreement already effectively requires this.) Because failure to comply could result in revocation of any supervised release term, the government can reasonably anticipate that it can still receive the full benefit of Defendant's future cooperation.

Second, Defendant's ability to testify at the Rule 15 deposition initially scheduled prior to sentencing has been frustrated by factors beyond her control. That is, Defendant has been ready and willing to complete her cooperation and states that she remains willing to testify at a future Rule 15 deposition. However, efforts to arrange such a Rule 15 deposition prior to this sentencing have been frustrated by factors beyond Defendant's control, including Isvanca's defense counsel's unavailability in the near future due to other commitments and concern about Isvanca's counsel's ability adequately to prepare for such a deposition given the scope of discovery to review and the other timing considerations described herein. Nor is the government in a position to prematurely force such a Rule 15 deposition, because, with Isvanca's counsel stating that she would not be adequately prepared, there was a significant potential issue with the admissibility of such a Rule 15 deposition in the record were it to proceed in January.

E. **Substantial Assistance**

Concurrently with this memorandum, the government is filing under seal an addendum describing the scope and nature of Defendant's substantial assistance to the government in its investigation and prosecution. That substantial assistance merits a 5K motion for a downward departure, which is incorporated as part of the government's sentencing recommendation in this case. Here, a downward departure of approximately 50% of Defendant's guidelines range is recommended.

## SENTENCING CALCULATION

A. **Statutory Maximums**

Defendant's conspiracy to commit wire fraud under 18 U.S.C. §§ 1349, 1343 carries a maximum sentence of 20 years of imprisonment; a fine of not more than $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3) and (d); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

---

Third, further delay of sentencing will likely diminish or extinguish the value to Defendant of any 5K departure she would hope to earn – that is, in her not unreasonable view, her time served will exceed the expected sentence, given her views about the sentencing range and the departure merited.

Fourth, Defendant's expressed primary concern is her ability to reunite with her two-year-old son, currently residing in the United Kingdom with his father/her husband. As a Romanian national, Defendant fears that, if her incarceration lasts beyond March 29 (the current "Brexit" deadline), she could be blocked from re-entering the country due to the felony conviction and the change "Brexit" could work on her opportunity to immigrate to the country where her son resides. Although the timing and nature of future Brexit impacts are speculative, the government recognizes Defendant's concern as not unreasonable.

Defendant's conspiracy to commit computer fraud under 18 U.S.C. §§ 371, 1030 carries a maximum sentence of 5 years of imprisonment; a fine of not more than $250,000 or twice the pecuniary gain or loss of the offense, pursuant to 18 U.S.C. § 3571(b)(3) and (d); a term of supervised release of not more than 3 years, pursuant to 18 U.S.C. § 3583(b)(2); and an obligation to pay any applicable interest or penalties on fines and restitution not timely made.

**B. Sentencing Guidelines Calculation**

As part of the plea agreement in this case, the parties agreed that the following Guidelines calculation applied, resulting in an advisory Guidelines offense level of 17, and a resulting advisory Guidelines range of 24-30 months of incarceration for Defendant, who is in Criminal History category I (all before the inclusion of other potential credit as described further below):

The parties agree that the highest offense of conviction is 18 U.S.C.§ 1349 and 18 U.S.C. § 1030(a)(4), so the applicable guidelines are §§ 2X1.1(a) and 2B1.1.

| | |
|---|---|
| Base Offense Level | 7 |
| U.S.S.G. § 2B1.1(a) (wire fraud/20 year maximum) | |

The parties agree the following specific offense enhancements under U.S.S.G are applicable (except as specifically noted in subsection D below):[2]

| | |
|---|---|
| §2B1.1(b)(1)(D)   Loss of more than $40,000 | +6 |
| §2B1.1(b)(2)(A) 10 or more victims | +2 |
| §2B1.1(b)(10) Fraud scheme committed outside USA | +2 |
| §2B1.1(b)(18)(A)(ii), conviction of §1030(a)(5)(A)  (apply the greatest applicable enhancement under (b)(18)) | +4 |
| Additional enhancements for the amazon/lakel scheme: | |
| §2B1.1(b)(17) § 1030 offense using personal information | +2 |
| Adjusted Base Offense Level | 23 |

---

[2] Defendant reserved the right to litigate whether the 4-level adjustment under § 2B1.1(b)(18) should instead be a 2-level adjustment.   *See* ECF 29 (plea agreement) at page 5.

10

|  |  |
|---|---:|
| Conspiracy, role in the offense §3B1.2(b) minor and minimal participant (parties agree to resolve the dispute between (a) and (b). *See*[] §6B1.4) | -3 |
| Adjusted Base Offense Level | 20 |

*See* ECF 29 (plea agreement) at page 3. The government agrees that the Defendant should receive an adjustment of three levels for acceptance of responsibility pursuant to § 3E1.1, resulting in a total offense level of 17.

Under the Guidelines grouping rules, the two conspiracy counts – which relate to a single factual conspiracy by the same individuals, executed concurrently, to perpetrate substantially the same kind of harm – online ransomware/extortion by hacking of victim computers and credit card fraud using information from hacked victim computers – should be grouped together, resulting in no change to the overall offense level. *See* U.S.S.G. § 3D1.2(d) ("All counts involving substantially the same harm shall be grouped together into a single Group. Counts involve substantially the same harm within the meaning of this rule . . . . (d) When the offense level is determined largely on the basis of the total amount of harm or loss, the quantity of a substance involved, or some other measure of aggregate harm, or if the offense behavior is ongoing or continuous in nature and the offense guideline is written to cover such behavior.").

The government notes that the PSR has calculated a different offense level, using the lower guidelines calculation from the second conspiracy count (conspiracy to commit computer fraud) under 18 U.S.C. §§ 371, 1030. The government respectfully disagrees and believes the agreed-upon guidelines calculation in the plea agreement is amply supported by the statement of facts.

# SENTENCING RECOMMENDATION

### A. Sentencing Factors

In *United States v. Booker*, 543 U.S. 220 (2005), the Supreme Court held that the Sentencing Guidelines are no longer mandatory. However, the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" and "should be the starting point and the initial benchmark" in determining a defendant's sentence. *United States v. Gall*, 552 U.S. 38, 46, 49 (2007). Accordingly, this Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Id.* at 49.

Next, the Court should consider all of the applicable factors set forth in 18 U.S.C. § 3553(a). *Id*. at 49-50. The Guidelines themselves are designed to calculate sentences in a way that implements the considerations relevant to sentencing as articulated in § 3553(a). *United States v. Rita*, 551 U.S. 338, 347-351 (2007). The § 3553(a) factors include, *inter alia*: (1) the nature and circumstances of the offense; (2) the history and characteristics of the defendant; (3) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, and to afford adequate deterrence to criminal conduct and protect the public from further crimes of the defendant; (4) the need to avoid unwarranted sentence disparities; and (5) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1)-(7).

### B. Sentencing Recommendation

The government recommends that the Court sentence the Defendant to a term of imprisonment of time served – that is, the approximately six months time served since her

12

detention in this matter on July 26, 2018, incorporating credit for over four months of detention awaiting extradition in the United Kingdom (from March 23 to July 26, 2018) and further time pursuant to *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), in recognition of Defendant's status as a deportable non-citizen. Under such a sentence, Defendant will serve, in the aggregate, approximately one year detained in various ways. The sentence should include a three-year period of Supervised Release including a special condition that the Defendant continue to cooperate with the government as required under the terms of her plea agreement and specifically including making herself available as necessary for the taking of any testimony in connection with this matter.

The government respectfully submits that such a sentence would adequately serve the interests of justice, considering the factors in § 3553(a), including among other things the severity of the offense but also the defendant's minor/minimal role therein, the history and characteristics of Defendant, the hardship of the time served given the distant separation from her very young child, the principles embodied in *Smith*, and – *particularly* – credit for her substantial assistance to the prosecution or investigation (that is, a downward departure pursuant to § 5K1.1 of the Sentencing Guidelines, which motion the United States incorporates into this sentencing memorandum).

1. **The Nature and Circumstances of the Offense**

The nature and circumstances of the offense is described above. As noted there, the Court should also be mindful of Defendant's minor/minimal role – that is, her individual conduct as distinguished from others in the conspiracy – that warrants a reduced sentence.

2. **The History and Characteristics of the Defendant**

The Defendant's history and characteristics are set forth in the PSR. They appear to indicate that the Defendant's participation in this offense was driven primarily by her relationship and involvement with her codefendant.

3. **The Need for the Sentence Imposed To Reflect the Seriousness of the Offense, To Promote Respect for the Law, To Provide Just Punishment; To Afford Adequate Deterrence; and To Protect the Public from Further Crimes of the Defendant**

In general, it is important to impose a sentence that will be sufficient to discourage other would-be cybercriminals from participating in such schemes. Indeed, general deterrence is a "crucial factor in sentencing decisions for economic" crimes. *United States v. Morgan*, No. 13-6025, 635 F. App'x 423, 450 (10th Cir. Nov. 6, 2015) (unpublished). The legislative history of section 3553 documents Congress's emphasis on general deterrence in white-collar crime. *See* S. REP. 98-225, 76, 1984 U.S.C.C.A.N. 3182, 3259 (need to deter others is "particularly important in the area of white collar crime"). "Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence." *United States v. Martin*, 455 F.3d 1227, 1240 (11th Cir. 2006) (internal quotations and citation omitted). The sentence here should promote respect for the law and send a cybercrime is a serious offense that warrant real punishment, as Congress and the Guidelines intend.

Here, however, several factors distinguish this sentencing from that of other cybercriminals. In particular, there is limited need for any special deterrence of this Defendant. Defendant is a limited risk for re-offending, given that she lacks the skills to independently

perpetrate such computer fraud offenses, given that this prosecution has likely severed her relationship with her codefendant and others involved in such offenses (not least because of their awareness of her cooperation here), and given that the hardship she faced in her arrest, extradition, and detention here serves as substantial deterrence from future criminal offenses.

In addition, there are other factors that make the government's reduced sentencing recommendation here just. As noted above, and as contemplated in the plea agreement, the government recommends that the Court award Defendant credit for over four months of detention she spent awaiting extradition in the United Kingdom (from March 23 to July 26, 2018) and further time pursuant to *United States v. Smith*, 27 F.3d 649 (D.C. Cir. 1994), in recognition of Defendant's status as a deportable non-citizen depriving her of opportunities the Bureau of Prisons might otherwise afford her to spend a portion of her sentence in community confinement. In addition, the Court may consider that the special hardship Defendant has already faced here – being extradited to a foreign country and incarcerated there, severely disrupting her relationship with her two-year-old son – is a factor warranting a reduced sentence.

### 4. The Need To Avoid Unwarranted Sentencing Disparities

The principal method to avoid unwarranted sentencing disparities is to adhere to the Sentencing Guidelines range. *See Gall v. United States*, 552 U.S. 38, 54 (2007) ("Since the District Judge correctly calculated and carefully reviewed the Guidelines range, he necessarily gave significant weight and consideration to the need to avoid unwarranted disparities."). Here, however, the government also has an interest in awarding sentencing credit for the Defendant's substantial assistance, in giving the Defendant due consideration for other periods of time served by Defendant in the United Kingdom and in forthcoming immigration detention, as well as the

considerations in *Smith* (loss of opportunities the Bureau of Prisons affords citizen incarcerees to serve a portion of their incarceration in community confinement), and considering the special hardship the Defendant may face reuniting with a minor child over a relative difference of mere months in her sentence.

### 5. The Need To Provide Restitution

Restitution is not sought in this matter, as MPD did not pay a ransom, and the loss amounts from the other offense conduct (e.g., credit card fraud) have not been specifically calculated or estimated.

### 6. The Nature and Extent of the Defendant's Cooperation

The government believes the Defendant's cooperation is relevant under § 3553(a) and/or in the calculation of Defendant's guidelines range. As noted above, the government recommends a downward departure of approximately 50% of the defendant's guidelines range.

## **CONCLUSION**

For the foregoing reasons and the information reflected in the SOF and PSR, the United States respectfully requests that the defendant be sentenced to a period of time served, as described above, with a three-year period of Supervised Release that includes as a special condition that the Defendant continue to cooperate with the government as required under the terms of her plea agreement, specifically including making herself available as necessary for the taking of any testimony in connection with this matter.

        Respectfully submitted,

        JESSIE K. LIU
        UNITED STATES ATTORNEY
        D.C. BAR NO. 472845

BY:   */s/ John P. Dominguez*
        John P. Dominguez
        D.C. Bar No. 959809
        Assistant United States Attorney
        555 4th Street, N.W., Room 4229
        Washington, D.C. 20530
        (202) 252-7684
        John.Dominguez@usdoj.gov